First matter is Bistrian v. Troy et al. Troy Levi I guess it is. Ready? Good morning to the panel, and may it please the Court. My name is John Kahn from the law firm of Archer & Greiner. On behalf of the 27 appellants, all current or former employees of the United States Bureau of Prisons at the Federal Detention Center in Philadelphia, I'd like to reserve two minutes for rebuttal time. Before I begin, I'd like to acknowledge that there are some members of the officials from the Federal Detention Center here, as well as the Department of Justice. The place right next door, right? That's right. Defendants, I assume, and not inmates? There are actually no appellants here today. They're just officials. The attorney advisor, Darren Howard, is here this morning.  The attorney advisor, Mr. Darren Howard, is here with us. Okay. Qualified immunity provides not only a defense to liability. We know what it is. What's your best... And to me, there's so much going on here. The only way I can get my head around this is to compartmentalize it. Sure. There are two different assaults we can look at. That's right. The issue with Wood may be the clearest, because it's clear there's no respondents per your... That's right. At least for my mind, anyhow, and we haven't discussed this, the one incident that seems to be the most troubling is the incident with, I guess it was Taylor, where the plaintiff was handcuffed first while there's a guy wielding a razor standing over him. The plaintiff was handcuffed after, at least the allegation is, after seven or eight of the institutional defendants watched the assault for a while. And I understand your position that they waited until there were enough people to go in and safely break this thing up. But why handcuff the plaintiff first? Why not try to subdue at least the attacker first? Again, this incident that occurred in October of 2006, I believe, Your Honor, occurred in the recreation yard of the special housing unit. It occurred while the inmates were just about to exit the recreation cage. It was the detention center's policy that before an inmate was taken from the recreation cage that each inmate was handcuffed before they were let from the cage. Mr. Bistrian was the second or third in line to be handcuffed. While he was being handcuffed by an official, that's when Mr. Taylor began his surprise attack on Mr. Bistrian. We submit that the federal detention center's policy, and at least securing inmates for the prison safety, for the safety of the officials as well as the inmates at that time, was reasonably, objectively reasonable. And further, to support a claim for failure to protect, Bistrian has to show that the prison officials were deliberately indifferent to a substantial risk of harm, that there was a pervasive risk of inmate attacks. And in this case, especially with this attack from inmate Taylor, there was no prior risk known to the officials. Was there any known relationship between Taylor and the group that Bistrian was in, and Bistrian's group that he was passing notes for? Not at all, Your Honor. There's nothing in the record that reflects that Mr. Taylor had any relationship with the Northington gang, and there's nothing pled in the complaint that would suggest that there was any relationship between the two groups. But there certainly was a relationship that existed, not so much with Taylor, but in June when you, I mean, it's hard to believe some of the things that happened here. The guy is helping out with respect to the passing of notes, and they put the photocopy into the actual note that's being passed, I mean, which is, you know, it does. I mean, it's almost like somebody did, you can't believe it happened. And then, so then he's put in, he's being told he's in trouble. He's being told by the people, Northington and others, that he's a lookout. And they put him together, and then when Northington and Savage and others are beating on him, how long, the allegation is, which we have to give at this point the inferences in favor of the plaintiff, that nobody came in immediately? I mean, how can you possibly claim that that's not a problem? And then you say, okay, fine, let's assume that's a problem, they get qualified immunity. But we know that that could be, could be, not necessarily is, they might still win. It goes to trial in that situation. Well, we know from the Iqbal decision that there has to be more than the possibility. No, it has to be plausible. It has to be plausible. And it's, this is more than a possibility. A certainty. I mean, this is, yeah. I mean, you put somebody who's deemed to be a snitch in with the people who are saying that they're going to hurt him, it's plausible he's going to get hurt. Well, I respectfully disagree that there was a certainty of inmate attack. I said it's plausible he could get hurt. I understand that. And Judge McKee made the comment that it was a certainty. We would disagree that it was, in fact, a certainty. From the pleadings. Well, forget certainty. Focus on plausibility. Focus even on the likelihood. Remember, it doesn't have to be greater than 50%. It's just, is there a reasonable possibility, reasonable probability, something less than 50%, but not down to zero, that he could have been injured as a result of being put in proximity of people who were threatening him? In the first instance, we submit that the complaint is sufficient because it doesn't state who of the appellants actually knew of this conduct, had a substantial and reasonable belief that he was going to be. I thought he said, he named a bunch of people. He named them as a group. Jezier and Vero? Exactly. And as Your Honor stated, some of these allegations are not believable, and we submit that the court should disregard conclusory allegations that aren't sufficiently supported by facts. What's not believable? What's not believable? That guy got hurt. Seriously. And that doesn't, there's inmate attacks that occur. I know, unfortunately, for any number of reasons, but that doesn't mean that prison officials are prescient, that they can determine the future. And, in fact, Mr. Bistrian was being confined in the special housing unit, which by regulation is recognized as one of the safest places for inmates. Yes, I mean, the problem is not the housing unit. I know that's a complaint, but that's, you've got a regulation, and there are cases that talk about utility of that, not only for punitive purposes and administrative purposes, but for protective purposes. That's not that troubling. But if you've got several people in the protective, in the SHU, and one of these people in the SHU is known to be cooperating against some other people in the SHU, I don't think it's a big deal to have them both in the SHU, but to put them both in a recreational facility together at the same time within the SHU, that seems to me is asking for trouble. But if the court were to look at the actual facts that are pled, Bistrian alleges in the second amended complaint, it's paragraph 86, that the assailants threatened him on several occasions. And if we just take that allegation, several occasions, on seven times, he alleges that he was threatened and nothing occurred at least six of those times. It's reasonable for the officers to believe that there was no real threat to his safety. It could have been a threat, but that doesn't mean that there's a substantial risk of harm. And further, if the court- I'll agree with you where you started. Your better argument may be qualified immunity, but to say that they're, you know, to keep somebody in the same unit as the people he cooperated against and then put him in a locked recreation area with those people doesn't make sense. And if that- I mean, you look at the Eighth Circuit case, the Reese case, which is somewhat similar to this. There is a constitutional violation. It's believed to be established, according to the court, and you don't get qualified immunity. Well, I'd submit that there's law in this circuit that would point the other way. In Counterman v. Warren County, it's at 176 Federal Appendix 234. It's a Third Circuit decision in 2006. But look at Pierce Capital from 2001, which says that it is a- more likely to be harmed by other inmates when your informant status is revealed. And again, we submit that those allegations that the status was in fact revealed are implausible. It's hard to believe that we're going to hold four appellants, each of them responsible for placing one note in an envelope, one copy of a note in an envelope, and hold them responsible for $50 million in damages. No, hold them responsible for not protecting him as- In the yard. In the yard. The problem is in the yard, not as- I mean, that could just be negligence. There's not a problem there constitutionally. And again, we submit that the plaintiff has to show that each appellant had the subjective element to understand that there was going to be a risk of harm. What more would be needed at this early stage of the litigation? Remember, this is where you have to take the allegations as essentially true. What more would be needed for- to cross the line and plausibly allege that prison officials were deliberately indifferent to the risk that he could be attacked? There would have to be an acknowledgment of that subjective intent by each appellant that there was an actual intent to inflict harm, and that wasn't the case here. He was actually, from the allegations, a cooperating witness. They didn't want to punish him. They didn't want to inflict harm. This was not- Why would they have to intend harm? Why not- They're indifferent to what may happen to him. Well, again, the courts have held that there must be this substantial risk and a subjective element of that claim is that there was this wanton- Before we get to the substantial- the subjective part, I think, is important here. But with respect to the excessive risk, I gather your position is that other than completely isolating a cooperating inmate, that there really is no way that a prison can protect the individual 24 hours a day and that it is just unreasonable to expect that a prison can do that, other than putting him in restrictive housing the entire time. Am I correct about that? That's correct, Your Honor. We're alleging our position is that the conduct was objectively reasonable. In fact, if these inmates wanted to attack Bistrian from the argument that there's no liberty interest in being placed in the general population, it also is asking the court to assume that he would have been a safer in general population or somewhere else. No, I agree with that. That's why I tried not to get on that road. The general population versus SHU seems to me is a losing argument. But the point- if you're going to leave him there, you don't have these people co-mingling together. Right. Or you transfer him. I mean, you know he's in danger. He's told people that he's been threatened. You've got to- something has to be done. Again, we submit that those allegations- But you have to take those allegations- we're not a summary judgment now. Okay. And we're asking the court to take in the totality of the circumstances. And we have post-incident reports that are part of the record where Bistrian says that he had a conversation with Northington about stamps the night before. And he believed- That comes up as summary judgment. We're at 12 v. 6 now, aren't we? Well, these are part of the pleading. And I'm sure that the plaintiff would like the court to ignore these facts which are incorporated in the complaint. But they're plainly a part of the record, the factual record, and the allegations. And the allegations that are- It does go to whether or not a 12 v. 1 or 12 v. 6 dismissal is appropriate vis-à-vis a summary judgment dismissal. Right. Go ahead. But, again, from Ashcroft v. Iqbal, we know that the court can use its judicial experience and common sense to resolve these issues to show what facts are actually plausible. And it's not looking to what would actually- what possibly happened, but what, in fact, happened. And, in fact, he alleges that he was threatened several times, and at least six of those seven, for instance, nothing happened. Again, it was objectively reasonable for the prisoners- for the officials in the prison to believe that he was in relative safety or that the threats weren't going to be acted upon. That might be a bridge too far. The fact that he's threatened seven times and nothing happens six times and to then argue that you can conclude from that that he's safe because these guys who threatened him before never did anything to him, that might be pushing it a little bit. And we would at least ask the court to look at the allegations as to each individual defendant. Let me- may I just ask a question on that? Give us your best argument on the individual liability and what has been pleaded and why it is deficient. It seems to me that may be your strongest point in all of this. Yes, Your Honor. Our best argument as to that point is that both the qualified immunity analysis as well as the jurisprudence of this circuit and the Supreme Court requires that an individual only be held liable for their own individual actions and that this group pleading of 17 or 8 or 6 appellants is not sufficient to meet that burden, to show that there's a constitutional wrong and to show that these individual appellants should have to go through the burdens of discovery before we get to the summary judgment stage. Are you saying he should specifically have alleged who- assuming that there was one person that he narrowed down to, who decided to put him in the yard at the same time with his assailant? That's correct, Your Honor. And name it in the complaint. Because it's plausible that- or possible that 6 of the 7 appellants knew that Northington shouldn't be in the same rec cage as Bistrian. But there's no allegations to show that these 6 appellants actually placed Mr. Bistrian in the rec yard. That they didn't make that mistake to do that. And so I think at this stage, we need more than just allegations of possibility of constitutional- How does- if it's in the record, if it's not in the record, don't answer it. But if it's in the record, how does it happen? Is there a set time during the day when everybody in a particular section of a particular unit goes into the rec yard? I assume it's not a situation where inmate A has a certain designated time, comes out, then inmate B goes in. There's some time, I guess set aside during the course of a day, maybe it's the same every day, where people in a certain unit or part of that unit have recreation and they have it together. Is that right? I don't know exactly if that's in the record. I can submit to the court at Appendix 438. There are the rules and procedures of the special housing unit which state that for recreation, each inmate will be offered recreation at least five times a day. It doesn't have a specific time. Five times a day? I'm sorry. That's better than I get and I'm not confined. Excuse me. Five days a week, Your Honor. Okay. I misspoke. None of these guys are all sober. And it also states that the recreation period will last for one hour, but I don't believe it's in the record in terms of what time. If we come to the conclusion that the complaint does not properly plead individual liability, is the remedy to send it back for leave to a plea to amend? Well, we think at this stage the plaintiff was represented by counsel throughout the civil process until a short period of time when it was appealed, had two opportunities to replete his complaint. The second time it was in reaction to a motion to dismiss that was followed by another one of the co-defendants, Gary Reynolds. I think at this point he's had ample opportunity even throughout the appellate proceedings to dismiss opponents that weren't individually named. And so I believe that that's enough at this point. Let me ask you a question about the you say at page 34 of your brief that the allegation that Bistrian made that the prison management defendants met weekly to decide whether to keep inmates in the SHU, and you said you're falling for failing to include allegations as to how the weekly meetings, this is a quote, as to how the weekly meetings reached its decisions. Example, my majority, supermajority unanimity. How in the world is he supposed to know that? Well, that's exactly the case, Your Honor. He doesn't know that. But that doesn't mean that just because these people, these officials met on a weekly basis that they're responsible for constitutional misconduct. In fact, they're responsible for keeping him in the SHU, and he's saying that they were deliberately indifferent for keeping him there because of the circumstances that existed. I mean, to say that he needs to know at this stage what actually how they voted, only they know how they voted, how they did their business. I respectfully disagree with the point that they were responsible. The BOP right here, that's his allegation, is they're responsible, they meet weekly. Somebody makes the decision to keep him in the SHU, right? Exactly, yes. And this management team makes that decision? That is not my understanding, no. Okay. And it's pled specifically in the complaint in paragraphs 18. What's the decision to keep him in SHU then? It would be the warden or the warden's designee, and that's specifically pled in the complaint, the BOP regulation that provides that. The warden has discretion to do it. The warden's still a party here only. I mean, you're saying some others may come out. That's correct. We believe that others should come out, just on that basis alone. Okay. Thank you. Thank you very much, Mr. Conner. Good morning, and may it please the Court. My name is Andrew Wilson. I represent the appellee, Peter Bistrian. Sort of just start where we left off, and then maybe pick up later on, but isn't most of the wrongdoing of Mr. Bistrian's complaint really attributable to warden Levy? No, Judge Ambrose.  to be responsible for the BOP regulation. individual liability concerning all of the defendants that remain in the complaint. In both the 309 paragraphs, but also significantly, in the 110 pages of exhibits that are attached to the complaint, each individual is assigned responsibility for their actions. These defendants can be generally divided into two groups. One is what we've called the prison management defendants. Those are the ones that you were discussing about earlier who met on a weekly basis to determine whether or not Mr. Bistrian should remain or not in segregated housing. Then there are six other individual officers who are named who had responsibility for either failing to intervene because they were told repeatedly by Mr. Bistrian about his risks, or specifically because they were either involved in the June 30th or the October 12th incident. And so those allegations provide liability for them for four claims. You used the term involved in, and that's part of the problem. That the complaint is pled, and I know you were, I don't mean to fault you because you were answering Judge Ambrose's question, but part of the problem here seems to be that the complaint looks at people who were involved in a particular procedure or a particular action or a particular decision and then draws certain allegations against those people who were involved in. And all we know about it is that they were involved in. We don't know whether or not they were actually ones who made the decision, only that they were involved in the decision. We don't know if they put him into the yard at the time of the attacks, only that they were, well then we don't even know if they were involved in the decision to put him in the yard. The complaint is so broad, it's basically that they were present when he was put into the yard, and were present when he was attacked, and were present as the attack continued and remained merely present and didn't intervene until enough colleagues were summoned to allow them to safely intervene, which I'm not that concerned about that. That seems like a no-brainer. You don't win until you're ready to go in to defend yourself and intercede. But those kinds of broad terms seems to me run exactly counter to what Iqbal says you have to plead. Well, Your Honor, I have two responses to that question. The first is that there are very specific allegations about which officers placed Mr. Bistrian in the recreation yard. There are first-person accounts from these officers describing exactly what they did, the exact time, who they were with. For example, Officer Jesior at Appendix 93, Paragraph 95, is alleged to have failed to intervene for minutes while we watched the pummeling. The individual exhibits at 273 to 275 relate to the October 12th incident. The exhibits from 230 to 261 at the appendix for the June 30th incident provide meticulous detail about who did what and when. But the second point is a broader point. What about Paragraph 38 in the complaint that talks about these prison management defendants and alleges that 10 of them made this collective decision? I think Judge Ambrose's question earlier is prescient here in that we need to consider whether Iqbal requires a prison inmate to have been in the room when the decision was made to keep him in administrative segregation. It does not. And I think, Judge McKee, your decision in Smith and Menziger from 2002 speaks to the issue of the failure to intervene. In that case, you wrote that, quote, we will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it. And you also went on to say, quote, an officer cannot escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers. That wasn't a pleading case, though. That was a summary judgment case. And that's the fact that we're on a motion to dismiss stage is a completely separate argument, which I think is a significant bar to finding qualified immunity here on these facts. But with respect specifically to these defendants who made this decision, their failure to intervene to stop either placement in the segregated housing unit or the assaults themselves is sufficient to state a claim to defeat qualified immunity. Let me ask you about that. You've got 17 defendants left with respect to counts one and two. And there's about four of them that I can't figure out how they really are involved in a way that would cause possible liability. And that first one would be Lieutenant Armasack. Yes, Your Honor. Can you explain why he should still be here? Well, there are two reasons, Your Honor. The first is that Lieutenant Armasack, at paragraphs 104 and 105 of the complaint, is alleged to have known of the risk that Mr. Bistrian faced while he was in the segregated housing unit. Lieutenant Armasack was in charge of the housing unit during the times that it was his shift in the housing unit, and Mr. Bistrian had regular contact with him and told him about his risk of being harmed. There's a case which is directly on point from this court from 1992. It's Young v. Quinlan. And in that case, the prison inmate plaintiff survived summary judgment on a claim for deliberate indifference against, among others, the warden and also Lieutenant London, who was in exactly the same position as Lieutenant Armasack is in this case. And there, the court held that the allegations that these ten defendants knew of the risk and failed to intervene to protect Mr. Young was sufficient to state a claim for deliberate indifference. Young was also a summary judgment. That was not a 12B6 case. No. And that presents all the more reason that it applies here. In Young, those allegations at summary judgment were sufficient to create an issue of fact that should go to a jury. Here, we have to assume that the allegations are true and they fit perfectly within the allegations that were disputed issues of fact in Young. Well, the thing is probably here is, and maybe I'm missing something, or maybe we're not on the same path. Here, it seems to me the problem is not whether or not the allegations taken together get you to an issue of fact, but whether or not the allegations are sufficient to survive the eight-ball problem, whether or not there's sufficiently specific allegations. How did the allegations, these group allegations, put each individual defendant on notice as to what they did wrong? The vast majority of the allegations in this complaint are not really contested. The number of days that Mr. Bistream was in confinement, the incidence of the assaults, these are cases that, these are facts that are not contested. The individual, the principal critique from the defendants are that they are pled to have undertaken conduct or they are pled to have knowledge in a list of people. So, for example, Lieutenant Armasack is pled to have knowledge of the risk to Mr. Bistream because Mr. Bistream told him over and over again that he was going to be harmed by the Northington gang. And the critique from the defendants is that not only does the pleading that Lieutenant Armasack was told that, but Lieutenant Armasack, Jesior, Knox, Dempsey, and Acker were told that. But simply listing these people in a row doesn't dilute the notice that they're being provided by the pleading. And that's exactly what took place in Young and Kinlan. Young and Kinlan, if you look at the footnotes in the beginning of that decision, there were, I think there were 27 defendants in that case. And they were because the inmate, just like Mr. Bistream here, had daily contact with a wide variety of officers who he continued to provide notice to. The district court in this case held that not only did these defendants have notice, they, quote, actually were the direct cause of the violence, close quote. That's in Appendix 44 and 45. So it does not lie in the defendant's mouth to say that they didn't have notice of the pleadings against them when all that's required under ICBAL is that the defendant provide them sufficient allegations that it raises a, quote, reasonable expectation that discovery will reveal evidence to support the claims. That's from a Supreme Court case, Matrix Initiatives, from 2011. Let's just go through. You've answered with respect to Armisac, although merely alleging that he knew without much more seems to perhaps be a problem. How about Lieutenant Wilson? This is for Count 1. Lieutenant Wilson is alleged to have prepared. In Count 1, the allegations, we're not bringing Count 1 against Lieutenant Wilson. Lieutenant Wilson is. I thought he was still left there. According to the district court's opinion, I thought he was left in. Lieutenant R. Wilson. For the purposes of the appeal, we would concede that the factual allegations against Lieutenant Wilson for Count 1 are insufficient. But Lieutenant Wilson is alleged to have prepared an administrative order putting Mr. Bistrian in administrative segregation for, quote, security reasons, but he prepared that seven months too late. That's at Appendix 104, Paragraph 99. And so the key claim against Lieutenant Wilson is actually the fifth claim, denial of procedural due process. So he should come out of Count 1 and Count 2? Yes. I'm confused about Wilson because you allege in Paragraph 98 this cause of action because the client was put in administrative detention without the required order, but in Paragraph 99 you allege that there's liability on the part of Wilson for preparing the administrative order. Am I missing something with that? Well, no, Your Honor, but the issue is that he was placed in administrative segregation in January 2006 and Wilson didn't prepare an administrative order placing him there for seven months until July. And so the allegation is that he was entitled to that order at the time he was placed in. He was entitled to it as a matter of administrative regulation. Yes. And constitutional due process. Under Hewitt and Helms, the Supreme Court provided that prisoners are entitled to an explanation for why they're being placed in administrative segregation and an opportunity to contest it. That applies to both Pitchfeld detainees at the time it was decided as well as? Under Hewitt and Helms from 1983, it applied to convicted prisoners, but this Court's decision in Boring and Kazak-Hewitt's from 1987 applied due process rights to those due process rights of pretrial detainees. Okay. What about Lieutenant Dempsey for count one? Lieutenant Dempsey witnessed the October 2006 attack and ineffectively deployed tear gas. That's at Appendix 273 is a report I believe authored by him, and the allegation is at Paragraph 109. He also authored a report. Why isn't that just negligence? He used tear gas, but he didn't use tear gas in an appropriate manner. Why isn't that just negligence? For the reason that he was on notice that there was a risk to harm to Mr. Bistrian because he knew that Bistrian was a disclosed informant and he failed to move him. And under this Court's decision, Hamilton and Levy from 1997, it is a fact question about whether prison officials, quote, did everything they could to protect an inmate. So it's inappropriate for the defendants to be making factual disputes about whether or not their failure to intervene at the motion to dismiss stage was reasonable. I'll also note that at 278 in the, pardon me, at 273 in the record, Lieutenant Dempsey concedes that his conduct was, quote, completely ineffective to stop the assault. What about Lieutenant Acker? Lieutenant Acker also witnessed the 2006 attack and failed to intervene, and the allegations against him are at Paragraph 109 at Appendix 97. In addition to the failure to intervene claims, there are substantive due process claims for punitive placement, procedural due process for denial of procedures when placing him in administrative segregation. And the last of the four claims he's pursuing on appeal is a First Amendment retaliation claim. Let me go to Count 3, which is the substantive due process, cruel and unusual punishment claim that his placement in continued detention in the SHU was constitutionally punitive. I've got about, of the 17 defendants left, I've got about seven that I've got concerns with, starting with Lieutenant Armasack there. Lieutenant Armasack, the claims against Lieutenant Armasack are that he failed to intervene to prevent the punitive placement in administrative segregation. That's the same theory that we're pursuing Lieutenant Bounds, Roger, and Robinson on. And it echoes the claims in Young and Kinlan where a prison inmate alleged that he told the lieutenants who were in charge of the SHU, he told the lieutenants who he met with on a regular basis, that he shouldn't be in the segregated housing unit and they did nothing to intervene. But the prison management defendants, the 10 that we've identified as a group, were the ones who were principally responsible for his placement in administrative housing. So those are the two theories. Of the three that you mentioned, Robinson, Rogers, and Bounds, you're saying that they should be included in Count 3 because? Because they failed to intervene to prevent him from being punitively placed in administrative segregation. Were they in a position to do anything about it? Did they have the authority with respect to any power to prevent that? Well, I don't think that the defendants argue, yes is our answer to that question. Defendants argue that they didn't have the regulatory authority to place him in or out of administrative segregation, but that was not sufficient to preclude those claims from going forward in Young and Kinlan. And I think I also would return to the strong language from Judge McKee and Smith and Messenger, which is admittedly a different context, but certainly speaks to the corrosive nature of inaction. The fact that these defendants were aware of the grave danger to Mr. Bistrian and did nothing about it is sufficient at a pleading stage to their inaction failed to prevent the substantive due process violation. What about Lieutenant Dempsey? Lieutenant Dempsey, bear with me. Lieutenant Dempsey, we're pursuing on Claim 2, but not Claim 3. I think he's still listed in Claim 3. How about Acker, Lieutenant Acker? The same, Your Honor. We are pursuing Acker on Claim 2, but not on Claim 3. Lieutenant Wilson? Lieutenant Wilson, as I said earlier, Claim 5, which is procedural due process violation for his – Did he come out of Claim 3 as well? Yes. Now, Claim 5, you say Armasack belongs in Claim 5? I have a number of people that I have problems there. Your Honor, Lieutenant Armasack does not belong in Claim 5. How about Lieutenant Dempsey? The same for Lieutenant Dempsey. Lieutenant Acker? I could perhaps take this a different direction. I can tell you that on Claim 5, we're pursuing the prison management defendants and Lieutenant Wilson. Those are the only ones for Claim 5. With respect to Claim 10, the First Amendment retaliation, we're pursuing only the prison management defendants. And why is he still included in Claim 5, Lieutenant Wilson? Because he is the one who authored the administrative order placing Mr. Bistrian in administrative segregation seven months too late in July of 2006. That's in Paragraph 99. It was not that he did the order, but the timing of the order, you're saying. It was too late at the time he did the order. That's what your argument is. Right. Well, it's a combination of it's too late and that it didn't provide him procedural due process because he was not given the reasons or an opportunity to contest because he was placed in and then he got the order seven months late. But the other problem is that it suggests misconduct that the prison official was backdating a report seven months too late. How do you, going back to the procedural due process, the placement in administrative confinement, how do you read the latest Supreme Court pronouncements on whether there's a liberty interest here? In punitive placement, I don't think that they disturbed Bell and Wolfish in 1979 that held that a pre-child AT&T has liberty interest in the conditions of their confinement and that they're violated if they amount to punishment. And for protection? I beg your pardon? For protection. Placement for protection or for other purposes other than administrative? The issue about whether or not it was appropriate to place Mr. Bistrian in administrative segregation for his own protection is a question of fact plainly under Hamilton and Levy. We allege that Mr. Bistrian said he would have been safer in general population. That's at paragraph 89 of the complaint. And the question about whether or not he would have or whether it was appropriate or whether, quote, the defendants did everything they could to protect him is a question of fact. It's not appropriate for a resolution on it. And with respect to what we've talked about as group pleading here, you're saying that every single one of the people that are defendants that are listed were decision-makers? They either were decision-makers. The prison management defendants were decision-makers for the purpose of placing in, let's say it another way, they either were decision-makers or they failed to intervene. And in each of the four claims, we have different theories about who was a decision-maker and who failed to intervene. The claims concerning placement in segregated housing, the decision-makers were the 10, the prison management defendants, and others who are named in those claims or failed to intervene in the placement. And then with respect to the assaults, specifically the June 6th assault, there's a failure to intervene claim against only Jezior. And with the October 6th assault, the failure to intervene claim is only against Knox, Dempsey, and Acker. As to saying that a group of people, each one in the group is a decision-maker, why would NICPOL require you to do more than that and show precisely to what extent they were decision-maker? Because the problem seems to me is if you have a group of, say, 11 people, six people say we're going to take this action with regard to this inmate, five people strenuously object to it, but they're outvoted. But the decision is made by that group of 11 people. Can you then go after the five dissenters who tried to use their authority to prevent the action that you're arguing gave rise to liability? And under your scenario, those five would be as liable as the six. At least they'd get through the pleadings to the same extent that the six would. It seems to me that maybe what the Supreme Court is saying in NICPOL is that you can't do that. If you've got a group of people who are decision-makers and five try to you can't lump everybody together to conclusory allegations and say the decision-makers are liable because they made the decision or they were present when the decision was made and failed to prevent the decision from being made. Does that make sense? I'm kind of thinking that through with you as I ask the question. I find NICPOL troubling because it seems to me that to kind of take the Prison Litigation Reform Act and square it, it makes prison litigation that much more difficult. Well, I have two responses to that question, Judge McKee. The first is that NICPOL does not require an inmate plaintiff to be in the warden's office at the moment that the decision is made in order to pass the pleading stage. Well, you'd think not, but look at what the court said. Well, no. What the court said is that the complaint needs to contain sufficient allegations to state a plausible claim. And in cases following that in this circuit. And to put the defendant on notice. Yeah, absolutely, Your Honor. And Judge Circa, in this court's decision, an argument of the U.S. Immigration and Customs Enforcement, that the admonishment is that we must take the, quote, complaint as a whole to determine whether it contains sufficient factual matter to state a facially plausible claim. Here, the fact that the decision, this is unlike Iqbal, where the claim was against the Attorney General of the United States. That's the problem with Iqbal. The facts there are terrible to try to apply to a case like this. Well, I think they're actually fine to apply to a case like this because they're completely different. We're not alleging that the Attorney General was involved in the decision to put Peter Bistrian in segregated housing. We're alleging that Warden Levy, who met with Peter Bistrian on a regular basis, who saw him in the jail every day, was responsible. Warden Levy, who knew that Peter Bistrian had been exposed as an informant with the FBI, who had complained repeatedly to Warden Levy. And Warden Levy is the highest one on the chain. And he's in a day-to-day connection. The problem is not the decision to put him in segregated housing. The problem is what happens to him once he's placed in there, going into the recreation area together with people who are intent on harming him and it seems to me, under circumstances, that reasonable people would have known that people are intent on harming him. Certainly. I mean, there are four claims, as I said earlier. So with respect to the assault claims, you're right, that we have not only do we have placement, but we also have placement in the caged recreation area, and we have failure to intervene. But with the other claims, punitive placement in administrative segregation, the substantive due process, the procedural due process rights, and the First Amendment retaliation claim, which includes the allegation that Warden Levy told Peter Bistrian that he, quote, would never see the light of day again. You know, we have very specified allegations concerning the placement of these individual decision makers, that they were taking the, that they were responsible, that they knew Peter Bistrian, and that they were directly, personally involved. That's completely different than Iqbal, which involved the Attorney General of the United States. Okay. Thank you very much. Thank you very much. Mr. Conyers, you have two minutes. I'd just like to very briefly address the Young v. Quinlan decision. And we submit that the facts of that case, and I acknowledge that that was on some re-judgment, are far different from the facts of this case, in that in the Quinlan decision, the court said the unrebutted facts show that Young was preyed upon by each succession of inmates, and that was documented on several occasions. And the court further held that the officials at the prison were knowledgeable about these successive incidents. That is far afield from what happened here. It is not a pervasive risk of harm that Bistrian was subjected to, but rather singular incidents of inmate assaults that don't rise to a level of a substantive due process violation. Further, with respect to the pleading standard in Iqbal that Judge Sirica mentioned, the court asked that there is more than the sheer possibility that a defendant acted unlawfully. And the court in Iqbal recognized that there's not respondeat superior liability, and there's not vicarious liability as well. So this group theory of liability is something that is not contemplated by the court. There has to be individual liability on behalf of each appellant. And the fact that they participated in a meeting and may have decided one way, or may have decided another way, does not state a constitutional violation. Let me read from Young and see why this isn't what we have here. The court said at one point, it is undisputed that these prison officials either did nothing or their response, if any, came too late to be of any help to Young. Now that seems to be applied to the recreation area here. It goes on to say, these prison officials contended that Young had informed them he was in danger only once and that upon investigation they were unable to confirm that. Young's allegation, this proposition is challenged by a prison official who stated in the affidavit that they voiced concern while in protective custody. And then we said, we conclude a material dispute exists, again at summary judgment, about the pervasive risk of harm to Young and other prisoners and whether or not it would arise at the level of deliberate indifference. Again, I'm not as concerned as the placement and the SHU because it seems to me the regulations allow clearly protective housing there. But coming back to the situation in the recreation area, why isn't, as Mr. Wilson suggested, Young squarely on point with that? Would it have made a difference if he had gone through it individually rather than saying the group individually named him? As a matter of fact, I think he did because he named who was in the group. And so they individually and therefore collectively failed to intervene. One, they put him into this situation and that by itself rises to the level of deliberate indifference knowing that he's a known informant. And then once the incident broke out, they didn't intervene. Well, again, I think under the totality of circumstances in Young where there's allegations that there was a successive assault on this particular inmate and the prison officials knew of these successive assaults that a pervasive risk of harm is more than one isolated incident. It's a pervasive condition. Does that mean the first time around there can be no liability? So if the inmate survives the first attack, the defendants need to be on guard because the second time, if he survives for a second time, there may be a cause of action under Bivens? Well, again, we're alleging a constitutional harm based on a subjective, an actual, close to an actual knowledge that the officials knew of this pervasive risk and did nothing. In this case, the suggestion is that isolated risk of harm is not the same as a pervasive risk of harm and that Bistrian hasn't pled facts to show that the officials in the prison actually appreciated the fact that there would be an attack and not just the threat of an attack. And if I can just submit to the court the counterman v. Warren County decision. It was a 2006 Third Circuit decision. What's the name of it? I'm sorry. Counterman v. Warren County at 176 Federal Appendix 234. Well, you're over time. If it were a presidential opinion, at least I'd be inclined to let you go, but this is one case where we've seen more NPOs cited to us than I've seen in a while and argued. And no matter how loud we declare it, we call them non-presidential opinions for a reason. They're non-presidential. So I appreciate your sharing with us, your enthusiasm for whatever we said in Warren County, but your time's up and we'll take that under advisement. Thank you, Your Honor. Thank you very much.